## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## SOUTHERN DIVISION
## No. 7:13-CV-23-F

| | |
|---|---|
| POLYQUEST, INCORPORATED, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | ) **ORDER** |
| | ) |
| VESTAR CORP, LLC, and LEE W. | ) |
| TARDIVEL, | ) |
| | ) |
| Defendants. | ) |

This matter is before the court on the Motion to Dismiss [DE-13] filed by Defendants Vestar

Corp, LLC ("Vestar") and Lee W. Tardivel ("Tardivel"), and the Motion for Leave to Amend

Complaint [DE-24] filed by Plaintiff Polyquest, Incorporated ("Polyquest"). For the reasons stated

herein, the Motion to Dismiss [DE-13] is DENIED in part and ALLOWED in part and the Motion

for Leave to Amend Complaint [DE-24] is ALLOWED.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This action arises out of Defendants' alleged tortious interference with a Security Agreement

entered into between Plaintiff Polyquest and a non-party to this action, EocPlas Polymers LLC

("Polymers).

Polyquest is a North Carolina corporation headquartered in Wilmington, North Carolina,

which is engaged in the business of distributing PET resins, manufacturing and distributing recycled

PET resins and processing PET scrap streams. *See* Marinelli Aff. [DE-22] ¶¶ 3, 6. PET resins are

a plastic substance used in a wide variety of products, including plastic bottles. *Id.* ¶ 6.

Polyquest alleges that during the period from June 2012 through November 2012, Tardivel,

a citizen of the United Kingdom who maintains a residence in New York, made several trips to North Carolina and attended multi-day meetings at Polyquest's headquarters for purposes of soliciting an investment by Polyquest into various joint ventures, including a proposed joint venture to operate a baled bottle recycling facility located in East Farmingdale, New York ("the Facility"). Compl. [DE-1] ¶ 9. The Facility's manufacturing operation consisted of taking recycled plastic bottles, and through a sorting and cleaning process, converting them into a plastic flake. *Id.* Tardivel is a member of Vestar, which is a Delaware limited liability company. *Id.* ¶ 2.

Following the negotiations, Vestar and Polyquest agreed to an arrangement under which a newly-formed Delaware limited liability company, Ecoplas Holdings, LLC ("Holdings") would own, as a wholly-owned subsidiary, another newly-formed Delaware limited liability company, Polymers. Holdings has two members: Defendant Vestar and PQ Capital Ventures, LLC ("PQ Capital"), a North Carolina limited liability company and affiliate of Polyquest. Compl. [DE-1] ¶ 10. In conjunction with this arrangement, Tardivel was appointed President of Holdings and Chief Executive Officer of Polymers. *Id.* ¶ 11. Additionally, Polymers and Vestar entered into a Management Services Agreement, under which Vestar was responsible for the day-to-day management of Polymer's business operations. *Id.* ¶ 18.

Polyquest alleges that the joint venture arrangement was at all times dependent upon a purchase of the operating assets of the Facility from a third party, the Coca Cola Company. *Id.* ¶ 12; Marinelli Aff. [DE-22] ¶ 8. In connection with this asset purchase transaction, Polyquest extended a $750,000 loan to Polymers, evidenced by a Promissory Note and secured by a Security Agreement. Compl. [DE-1] ¶ 12; Exs. A (Promissory Note) & B (Security Agreement). Under the Security Agreement, Polymers agreed that it would:

2

- Maintain all of its leases and conduct its business in an orderly and efficient manner in accordance with good business practices.
- Maintain its assets, invoices, and checks separate from and not commingled with any of those of any other person or entity.
- Not commingle its assets with the assets of any of its managers, members, affiliates, principals or any other entity.
- Not, without the consent of Polyquest, pay management fees, salary, bonus, commission, consulting fees or other compensation to the members, managers and officers of Polymers, Holdings, or any entity that is a member of Holdings.
- Pay all taxes and charges imposed on the collateral securing its indebtedness to Polyquest.

Compl. [DE-1] ¶¶ 13-17; Ex. B at ¶¶ 2A(b); 2A(c); 2B(c); 2B(e); 3.

Polyquest alleges that at some point in time, it became aware that Defendants were not performing their obligations under the Management Services agreement, to the detriment of Polymers and in apparent violation of the Security Agreement. Specifically, Polyquest alleges that Defendants intentionally caused Polymers to fail to pay rent owed to the landlord of the Polymers Facility; to fail to pay its utility providers and other trade creditors, and to fail to pay, withhold and remit applicable payroll and unemployment taxes. Compl. [DE-1] ¶ 25.

Polyquest also alleges that less than two weeks after the execution of the Note and Security Agreement by Polymers, Polymers contracted to sell Unifi Manufacturing, Inc. ("Unifi") five or more inventory loads of plastic flake owned by Polymers. Compl. [DE-1] ¶ 19. Per the terms of the contract, the product was to be shipped from Polymers' place of business in New York to Unifi's place of business in Yadkinville, North Carolina. *Id.* The Unifi Order was evidenced by a purchase order submitted by Unifi to Polymers. *Id.*, Ex. D.

According to Polyquest, following the initiation of the Unifi Order, Defendants caused invoices for the Unifi Order to be submitted to Unifi in the name of Vestar, not Polymers, and

3

directed that payment be made directly to Vestar rather than Polymers. Compl. [DE-1] ¶ 20. Polyquest alleges that Defendants' actions were for the purpose of intentionally converting Polymer's product, and the payments derived therefrom, to Defendant's use and benefit to the detriment of Polymers and Plaintiff, and were in violation of the Security Agreement. *Id.*

Accordingly, upon learning of the invoicing for the Unifi Order, Polymers sent a letter dated January 16, 2013 to Unifi, notifying it of the conversion and directing payment to Polymers at its North Carolina address. *Id.* ¶ 21; Ex. E. On that same date, the Management Services Agreement between Vestar and Polymers was terminated, and Tardivel was removed as an officer of Holdings and Polymers. Compl. [DE-1] ¶ 27; Ex. G. On the following day, January 17, 2013, Polyquest sent Polymers a Notice of Default. Compl. [DE-1] ¶ 26; Ex. F.

Polyquest alleges, notwithstanding the foregoing, that Tardivel still directed Unifi to wire payment for the Unifi Order to a Chase bank account of Polymers to which Tardivel had direct access and control. Compl. [DE-1] ¶ 22. Polyquest alleges that Tardivel promptly changed the passwords to the Polymers' Chase account, thereby denying Polymers' chief financial officer, Randy M. Bragg, and its chief operating officer, George Smilow, any ability to access or review activity in the Polymers' Chase account. Compl. *Id.* On or about January 22, 2013, Defendants initiated three electronic, online transfers from this Polymers' Chase account in the amounts of $20,000, $50,000, and $100,000, respectively, to an account ending the digits "256." *Id.* ¶ 23. Polyquest contends that this account is maintained by Vestar or Tardivel. *Id.* ¶ 23.

On January 24, 2013, Polyquest, through its counsel, sent Tardivel a letter demanding return of the $170,000 in withdrawn funds to Polymers. *Id.* ¶ 28; Ex. H. Tardivel failed to comply with this demand. Compl. [DE-1] ¶ 28. Polyquest contends that both Defendants have acknowledged that

4

they authorized the transfer for these monies from Polymers' Chase account. *Id.* ¶ 24. According to Polyquest, Defendants claim, falsely, that the transfers were payment for Vestar's management fee. *Id.* Polyquest asserts that payment for any such fee would be owed, if at all, by Holdings, and not by Polymers. *Id.*

Polyquest then initiated this action in this court on January 31, 2013, alleging claims for tortious interference with contract and unfair and deceptive trade practices in violation of N. C. Gen. Stat. § 75-1.1. Defendants thereafter filed a Motion to Dismiss [DE-13], arguing that the action must be dismissed pursuant to Rule 12(b)(2) for lack of personal jurisdiction over the Defendants, or in the alternative, dismissed pursuant to Rule 12(b)(3) for improper venue. Defendants also argue that the Complaint must be dismissed pursuant to Rule 12(b)(6) for failure to state a claim. Polyquest has filed a response [DE-21] and Defendants have replied [DE-26], and the Motion to Dismiss is therefore ripe for disposition.

While the parties were briefing the Motion to Dismiss, Polyquest also filed a Motion for Leave to Amend Complaint [DE-24], whereby Polyquest seeks to file an Amended Complaint which adds an additional claim for conversion of security. Defendants have responded [DE-27], and this motion also is ripe for disposition.

## II. MOTION TO DISMISS

Because Defendants' Motion to Dismiss concerns, in part, the court's power to hear this case, the court will address that motion first.

### A. Motion to Dismiss for Lack of Personal Jurisdiction

Under Federal Rule of Civil Procedure 12(b)(2), the party asserting personal jurisdiction has the burden to prove the existence of a ground for jurisdiction by a preponderance of the evidence.

5

*Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005). "Where a challenge to personal jurisdiction is addressed only on the basis of motion papers, supporting legal memoranda, and the relevant allegations of the complaint, 'the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis to survive the jurisdictional challenge." *Pan-American Prods. & Holdings, LLC v. R.T.G. Furniture Corp.*, 825 F. Supp. 2d 664, 676 (M.D.N.C. 2011) (quoting *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989)). In that instance, the court "must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Combs*, 886 F.2d at 676. "[W]here the defendant provides evidence that denies the facts essential for jurisdiction, the plaintiff must present sufficient evidence to create a factual dispute on each jurisdictional element which has been denied by the defendant on which the defendant has presented evidence." *Pan-American*, 825 F. Supp. 2d at 676 (citing *Pinpoint IT Servs., L.L.C v. Atlas IT Export Corp.*, 812 F. Supp. 2d 710, 716-17 (E.D. Va. 2011); *Indus. Carbon Corp. v. Equity Auto & Equip. Leasing Corp.*, 737 F. Supp. 925, 926 (W.D. Va. 1990)). At this stage, if the court determines that a plaintiff has established a prima facie showing of personal jurisdiction, the court "will proceed as if it has personal jurisdiction over the matter, although factual determinations to the contrary may be made at trial." *Pinpoint*, 812 F. Supp. 2d at 717 (citing 2 James W. Moore et al., *Moore's Federal Practice* ¶ 12.31 (3d ed. 2011)).

Analysis of personal jurisdiction consists of a two-part inquiry. First, the court must determine whether North Carolina's long-arm statute authorizes the exercise of personal jurisdiction over the defendants. *See Christian Scientist Bd. of Directors of First Church of Christ v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001). Second, if the long-arm statute does authorize jurisdiction, then the

6

court must examine whether the exercise of personal jurisdiction comports with the Due Process Clause of the Fourteenth Amendment. *See id.* North Carolina's long-arm statute, N.C. Gen. Stat. § 1-75.4, was enacted "to make available to the North Carolina courts the full jurisdictional powers permissible under federal due process." *Dillon v. Numismatic Funding Corp.*, 231 S.E.2d 629, 630 (N.C. 1977). Because North Carolina long-arm jurisdiction has been interpreted to be coextensive with the limits of due process, the normal two-step personal jurisdiction test has been collapsed into a single inquiry of whether the exercise of jurisdiction comports with due process. *See Nolan*, 259 F.3d at 215. That is, the court in this case need only inquire into whether "the defendant has such 'minimal contacts' with the forum state that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Nolan*, 259 F.3d at 215 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). In other words, a defendant must have purposefully established minimum contacts with the forum state such that he "should reasonably anticipate being haled into court" there. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985).

"The requisite contacts may be established by way of general or specific jurisdiction." *Hardee's Food Sys., Inc. v. Beardmore*, 169 F.R.D. 311, 314 (E.D.N.C. 1996). General jurisdiction enables a foreign forum to exercise jurisdiction over a defendant due to the defendant's "continuous and systematic" contacts with the forum. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 404, 414-16 (1984). Specific jurisdiction exists when a plaintiff's cause of action arises out of the defendant's conduct with the forum state. *See Consulting Engineers*, 561 F.3d at 277. As the Fourth Circuit has noted, the "threshold level of minimum contacts to confer general jurisdiction is significantly higher than for specific jurisdiction." *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 623 (4th Cir. 1997).

7

Here, Polyquest concedes the question of general jurisdiction, *see* Mem. in Opp. to Def.'s Mot. to Dismiss [DE-21] p. 10, and accordingly the court will limit its analysis to specific personal jurisdiction. "With respect to specific jurisdiction, '[t]he touchstone . . . remains that an out-of-state person have engaged in some activity purposefully directed toward the forum state.'" *ESAB Group*, 126 F.3d at 625 (alteration in original) (quoting *Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939, 941-46 (4th Cir. 1994)). In the Fourth Circuit, courts typically engage in a three-part inquiry to determine if specific jurisdiction exists, examining "'(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable.'" *Consulting Engineers*, 561 F.3d at 278 (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002)). Each prong of this test must be satisfied for a court to exercise personal jurisdiction over a party. *Id.*

Defendants concede that they have contacts with North Carolina.[1] They argue, however, that Polyquest's claims against them do not arise out of Defendant's contacts with North Carolina, and therefore the second prong of the specific jurisdiction test has not been met. Specifically, Defendants note that Polyquest's claims are based on Defendants' alleged tortious interference with the Note and Security Agreement between Polyquest and Polymers. Defendants further observe that Polyquest's claims arise from Defendants allegedly (1) converting Polymers inventory and re-marketing that inventory as if it were owned by Vestar; (2) withdrawing $170,000 from Polymers' bank account and paying those funds to themselves; (3) causing Polymers to pay Vestar's management fee; and (4)

---

[1] The court agrees that Polyquest has met its prima facie showing that Defendants purposefully availed itself of the privilege of conducting activities in North Carolina. *See* Pl.'s Mem. [DE-21] p. 10 (summarizing Defendants' contacts with North Carolina).

failing to cause Polymers to conduct its business practices in a good and efficient manner, including failure to timely pay Polymers' landlord, taxes and creditors. *See* Compl [DE-1] ¶ 29. Defendants argue that all these actions, which relate to Defendants' operation and management of Polymers, occurred in New York and not North Carolina. Although Defendants recognize that some of the allegations concerning their management of Polymers includes their invoicing a North Carolina company for product actually sold by Polymers, and later contacting that same North Carolina company with instructions to deposit money in Polymers' account, Defendants maintain that these actions, too, were confined to New York.

Polyquest, in turn, argues that Defendants takes too restrictive view of the requirement that a claim arise from or relate to a defendants' contacts with a forum state. Rather, according to Polyquest, "[i]t is sufficient to show that plaintiff felt the brunt of the harm from the alleged tortious activity in the forum state, that defendants expressly aimed their tortious conduct at the forum state or that the activity arose out of a contractual or collaborative relationship established with a North Carolina-based entity." Pl.'s Mem [DE-21] p. 11. Polyquest's argument implicates two distinct issues. The latter portion of the argument concerns what it means for a claim to "arise out of" or "relate to" a defendant's contacts with a forum. The former portion of Polyquest's argument concerns whether a defendant's tortious conduct outside the forum can nevertheless be characterized constitutionally sufficient contacts. *See Calder v. Jones*, 465 U.S. 783, 789 (1984); *Consulting Engineers*, 561 F.3d at 280.

The court considers the "arise out of" or "relate to" question first. Again, the second part of the test for specific jurisdiction requires that the defendant's contacts with the forum state form the basis of the suit. *Consulting Engineers*, 561 F.3d at 278-79 (citing *Burger King*, 471 U.S. at 472,

9

*Helicopteros*, 466 U.S. at 414). Accordingly, a plaintiff's claims must "arise out of or relate to" the defendant's contacts with the forum state. *Helicopteros*, 466 U.S. at 414. "Unfortunately, the Supreme Court has not yet explained the scope of this requirement." *O'Connor v. Sandy Lane Hotel Co. Ltd.*, 496 F.3d 312, 318 (3d Cir. 2007) (citing *Helicopteros*, 466 U.S. at 415 n.10). Lower courts, however, have tackled the issue, and a review of cases shows that "[t]hree approaches predominate." *Id.*

The first, and most restrictive approach, has been called the "proximate cause" or "substantive relevance" test. *Id.* Some courts utilizing this approach hold that the defendant's in-state conduct must give birth to the cause of action—or, in other words, be the "legal cause" of the plaintiff's injury. *See id.* (citing *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 35 (1st Cir. 1998)). Put another way, "this test examines whether any of the defendant's contacts with the forum are relevant to the merits of the plaintiff's claim." *Id.* at 318-19. The second, more relaxed, approach, commonly known as the "but for" standard, "is satisfied when the plaintiff's claim would not have arisen in the absence of the defendant's contacts." *Id.* at 319 (citing *Shute v. Carnival Cruise Lines,* 897 F.2d 377, 385-86 (9th Cir. 1990) *rev'd on other grounds* 499 U.S. 585 (1991)). Finally, the least restrictive approach, known as the "'substantial connection" or "discernible relationship" standard, examines the totality of the circumstances to determine "whether the tie between defendant's contacts and the plaintiff's claim is close enough to make jurisdiction fair and reasonable." *Id.* (citing *Chew v. Dietrich*, 143 F.3d 24, 29 (2d Cir. 1998)).

The Fourth Circuit has yet to explicitly adopt a particular approach, but in at least one decision, *CFA Institute v. Institute of Chartered Financial Analysis of Virginia*, 551 F.3d 285 (4th Cir. 2009), it appears to have employed the "but for" standard. In that case, the court found that a

10

Virginia non-profit's claims against an Indian corporation for trademark infringement, unfair competition, and breach of contract "arose out of [the Indian corporation's ] Virginia-related business transactions." *Id.* at 296. In so doing, the Fourth Circuit observed that the Indian corporation's 1984 visit to the non-profit in Virginia was "the genesis of the dispute." *Id.* at 295. Specifically, "[t]he visit prompted the parties to enter into the License Agreement; [the Indian corporation's] subsequent infringement of the [non-profit's] rights under the License Agreement resulted in the Settlement Agreement . . . ; and [the Indian corporation's] breach of the Settlement Agreement resulted in this lawsuit." *Id.* In the Fourth Circuit's view, this demonstrated a "seamless series of business transactions from [the] 1984 Charlottesville visit to the filing of the Complaint." *Id.* The Fourth Circuit's analysis appears to hew more closely to the "but for" approach than any of the other approaches utilized by other courts.

Using the same "but for" approach in this case leads to the conclusion that Polyquest's claims arise out of, or relate to, Defendants' contacts with North Carolina. If the 1984 visit to Virginia in *CFA Institute* can be said to be the genesis of that dispute, then Defendants' actions in reaching out to a North Carolina corporation, traveling several times to North Carolina to solicit that corporation's participation in a joint venture, and eventually securing a managerial role in the execution of that joint venture is the genesis of the instant dispute. The court does not adopt Defendants' view that for a claim to "arise out of or relate to" a parties' contacts with the forum state, those contacts must be the proximate cause of the injury leading to a plaintiff's claims. Accordingly, the court finds that Plaintiffs' claims arise out of or relate to Defendants' contacts with North Carolina. Having so concluded, the court does not reach Polyquest's alternative argument that Defendants' actions outside North Carolina can nevertheless be considered constitutionally sufficient minimum contacts.

11

The court therefore turns to the third prong of the specific jurisdiction test: whether the exercise of personal jurisdiction over Defendants would be constitutionally reasonable. In assessing this, the court considers factors such as "(1) the burden on the defendant in litigating in the forum; (2) the interest of the forum in adjudicating the dispute; (2) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of the dispute; and (5) the interests of the states in furthering substantive social policies." *Consulting Engineers*, 561 F.3d at 279. Defendants do not argue that any of these factors weigh against finding that this court's exercise of personal jurisdiction over them is constitutionally reasonable. Defendants have demonstrated that they are capable of defending themselves in this state, and it is no less convenient for Defendants to litigate this action here than it is for Polyquest to litigate this action in New York.[2] Additionally, it cannot be said that North Carolina does not have an interest in providing a forum for the resolution of this conflict. Consequently, the exercise of personal jurisdiction over Defendants by this court will not "make litigation so gravely difficult and inconvenient that a party unfairly is at a 'severe disadvantage' in comparison to his opponent.'" *Nolan*, 259 F.3d at 217 (quoting *Burger King*, 471 U.S. at 478).

Accordingly, because this court may exercise specific jurisdiction over Defendants, the motion to dismiss on the basis of lack personal jurisdiction is DENIED.

---

[2] Indeed, Defendant Tardivel signed on behalf of the yet-to-be-formed Vestar a Confidentiality Agreement with Polyquest providing that "each party irrevocably and unconditionally submits to the jurisidiction" of the courts of North Carolina. *See* Marinelli Aff. [DE-22], Ex. A. Although this litigation does not concern the terms of the Confidentiality Agreement, the court does find this fact significant in assessing Vestar and Tardivel's burden in litigating in this forum.

12

## B. Motion to Dismiss for Improper Venue

When a defendant moves to dismiss for improper venue pursuant to Rule 12(b)(3), and no

evidentiary hearing is held, "the plaintiff need only make a prima facie showing of venue." *Mitrano*

*v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004). 28 U.S.C. § 1391 provides the statutory framework for

determining proper venue. Subsection (b) provides that a civil action may be brought in

(1) a judicial district where any defendant resides, if all defendants are residents of
the State in which the district is located;
(2) a judicial district in which a substantial part of the events or omissions giving rise
to the claim occurred, or a substantial part of property that is the subject of the action
is situated, or
(3) if there is no district in which an action may otherwise be brought as provided in
this section, any judicial district in which any defendant is subject to the court's
personal jurisdiction with respect to such action.

*Id.*

Residency for venue purposes is defined by 28 U.S.C. § 1391(c). Pertinent to this action, "an

entity with the capacity to sue and be sued in its common name under applicable law, whether or not

incorporated, shall be deemed to reside, if a defendant, in any judicial district in which such

defendant is subject to the court's personal jurisdiction with respect to the civil action in question."

28 U.S.C. § 1391(c)(2); *see also* § 1391(d) ("[I]n a State which has more than one judicial district

and in which a defendant that is a corporation is subject to personal jurisdiction at the time an action

is commenced, such corporation shall be deemed to reside in any district in that State within which

its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate

State, and, if there is no such district, the corporation shall be deemed to reside in the district within

which it has the most significant contacts."). A natural person, however, "including an alien lawfully

admitted for permanent residence in the United States, shall be deemed to reside in the judicial

13

district in which that person is domiciled." 28 U.S.C. § 1391(c)(1). Correspondingly, then, "a natural person who is an alien but not admitted for permanent residence in the United States may be sued in any district." 14D CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 3810 (3d ed. 2009); *see also* 28 U.S.C. § 1391(c)(3) ("[A] defendant not resident in the United States may be sued in any judicial district, and the joinder of such a defendant shall be disregarded in determining where the action may be brought with respect to other defendants.").

Under the plain terms of § 1391, Defendant Vestar is considered a resident of North Carolina, and more specifically, the Eastern District of North Carolina, because it is subject to personal jurisdiction here. Plaintiff also has alleged that Tardivel is a citizen of the United Kingdom, where he is domiciled, although he maintains a residence in New York. Compl. [DE-1] ¶ 3. Tardivel's declaration confirms this. *See* Decl. of Tardivel [DE-13-1] ¶ 1 ("I have been a citizen of the United Kingdom my entire life. I still own property in the United Kingdom, but I also maintain a residence in New York County, New York."). Tardivel's declaration does not suggest that he has been admitted for permanent residence in the United States. Accordingly, the fact that he maintains a residence in New York is of no importance for venue purposes. He may be sued in any district, for purposes of venue. *See* FEDERAL PRACTICE & PROCEDURE § 3810.

Because Vestar is subject to personal jurisdiction in this district, and is therefore deemed to be a resident thereof, venue is proper under § 1391(b)(1). Defendants' motion to dismiss on the basis of improper venue is therefore DENIED.

## C. Motion to Dismiss for Failure to State a Claim

Defendants also move to dismiss, on the basis of failure to state a claim, Polyquest's claims for tortious interference with contract and for unfair and deceptive trade practices.

14

The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint, not to resolve conflicts of fact or to decide the merits of the action. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir. 1999). In considering a motion to dismiss, the court assumes the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). However, the "'[f]actual allegations must be enough to raise a right to relief above the speculative level' and have 'enough facts to state a claim to relief that is plausible on its face.'" *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *Ashcroft v. Iqbal*, __ U.S.__, 129 S. Ct. 1937, 1950 (2009) ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555 (citations omitted). Moreover, a court "need not accept the legal conclusions drawn from the facts" nor "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'shp.*, 213 F.3d 175, 180 (4th Cir. 2000).

## 1. Tortious Interference

Polyquest alleges that Defendants tortiously interfered with Polymer's duties and obligations under the Security Agreement between Polymers and Polyquest. Under North Carolina law,[3] the elements of tortious interference with contract are:

---

[3] The parties have assumed, for purposes of this motion, that North Carolina law governs Polyquest's claims. The court will do the same.

(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in so doing acts without justification, (5) resulting in actual damage to plaintiff.

*United Labs, Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988). Defendants contend that Polyquest has failed to allege sufficient facts to establish the third, fourth, and fifth elements of such a claim. The court disagrees.

With regard to the third element, Defendants contend that Polyquest has failed to allege a material, as opposed to technical, breach of the Security Agreement. Specifically, Defendants argue that Polyquest was required to provide Polymers with notice, and an opportunity to cure, the alleged breaches of the Security Agreement. Because the Complaint does not allege that Polyquest did so, Defendants argue that the tortious interference claim must fail. Defendants, however, do not cite, and this court has not been able to locate, a case distinguishing between "technical" and "material" breaches as they relate to tortious interference claims under North Carolina law. The court also notes that the attachments to the Complaint show that Polyquest viewed some of the alleged breaches as being "incurable," and therefore it believed no notice was required. *See* Compl. Ex. E [DE-1-6]. Accordingly, the court declines to rule, at this juncture, that as a matter of law "technical" breaches of a contract are insufficient to support a tortious interference claim.

The court finds Defendants' additional argument with regard to the third element–that the sale of the Polymers' inventory to Unifi was in the ordinary course of business, and therefore, could not be a breach of the Security Agreement–to constitute a seemingly willful misreading the Complaint. It was not the sale of inventory to Unifi that constituted the breach; it was Defendants' alleged actions in invoicing Unifi in the name of Vestar, and eventually converting Unifi's payment

16

for the inventory.

With regard to the fourth element, requiring that a defendant act without justification, Defendants contend that the complaint is deficient for two reasons. First, they argue that as "non-outsiders," they are entitled to assert a qualified privilege. Second, Defendants assert that the Complaint shows on its face that there was an obvious, legitimate business justification for their actions. The court finds that neither argument is sufficient to dismiss Polyquest's claim for tortious interference.

As to the first argument, Defendants are correct that under North Carolina law, "corporate insiders" such as "[o]fficers, directors, shareholders and other corporate fiduciaries have 'a qualified privilege to interfere with contractual relations between the corporation and a third party.'" *Embree Constr. Group v. Rafcor, Inc.*, 330 N.C. 487, 499, 411 S.E.2d 916, 924 (1992) (quoting *Wilson v. McClenny*, 262 N.C. 121, 133, 136 S.E.2d 569, 578 (1964)). "The privilege, however, is qualified, not absolute; the presumption that the officers's acts are in the corporation's interest and thus justified is overcome when the means or the officer's motives are improper." *Id.* Accordingly, a plaintiff may still state a claim for tortious interference against an "insider" defendant where the plaintiff alleges facts showing that defendant's actions were in his own personal interest. *Id.* at 499, 411 S.E.2d at 925-25. Here, Polyquest has alleged facts that support the inference that Defendants' actions were taken to benefit themselves, at the expense of Polymers. *See* Compl. [DE-1] ¶¶ 20, 22, 23, 24. Additionally, some of the actions underlying Polyquest's claim–namely, the alleged conversion of $170,000.00 from Polymers' bank account–allegedly occurred after Defendants' were relieved of their management responsibilities at Polymers. Accordingly, Polyquest's claim for tortious interference does not fail, at this juncture, on the basis of the qualified privilege.

17

Similarly, Defendants' assertion that their actions were supported by an obvious, legitimate business justification also does not preclude Polyquest's claim. "Whether an actor's conduct is justified depends upon 'the circumstances surrounding the interference, the actor's motive or conduct, the interests sought to be advanced, the social interest in protecting the freedom of action of the actor[,] and the contractual interests of the other party.'" *Embree Construction*, 330 N.C. at 924, 411 S.E.2d at 498 (quoting *Peoples Security Life Ins. Co. v. Hooks*, 322 N.C. 216, 221, 367 S.E.2d 647, 650 (1988)) (alteration in original). Defendants assert that the Complaint, and the attachments thereto, show that the sale of inventory to Unifi was in the ordinary course of business, and expressly consented to by Polyquest. *See* Security Agreement [DE-1-2] ¶¶ 2(b)(g) & 3(g) (allowing the sale of inventory in the ordinary course of business). The court, however, finds that such an argument amounts to almost a willful misreading of the allegations of the Complaint. Polyquest does not allege that sale of inventory by *Polymers* resulted in the breach of security agreement. Rather, Polyquest alleges that Defendants' actions in later sending an invoice to Unifi in the name of Vestar, and then directing Unifi to wire payment to a Polymers' account and then transferring the wired funds out of the account–despite explicit instructions to the contrary–was one of the breaches of the security agreement. Compl. [DE-1] ¶¶ 20, 22, 23. The facts, as alleged, do not show that Defendants' actions were in the ordinary course of business. Furthermore, to the extent that Defendants contend that they had the authority to send the invoice to Unifi in the name of Vestar, the court notes that any such authority seemingly would not extend to Defendants' later actions in re-directing the payment and transferring the funds out of Polymers' account. *See* Compl. [DE-1] ¶¶ 22-23, 27 (alleging that the Management Services Agreement between Vestar and Polymers was terminated and Tardivel was removed as an officer of Holdings and Polymers on

18

January 16, 2013, and that the transfer of funds out of Polymers account occurred on January 22, 2013). Consequently, the court finds that Polyquest has alleged sufficient facts to support the allegation that Defendants' actions were taken without justification.

Finally, Defendants contend that Polyquest has failed to allege that Defendants' alleged interference with the Security Agreement resulted in actual damages to Polyquest. As Polyquest observes, however, it has explicitly alleged that it has suffered damages as a result of Defendant's actions in causing Polymers to breach the Security Agreement. Compl. [DE-1] ¶ 32. The court finds this sufficient at this juncture to satisfy the fifth element.

Because Polyquest sufficiently alleged all the elements of tortious interference with contract, Defendants' motion to dismiss that claim is DENIED.

## 2. Unfair and Deceptive Trade Practices Claim

Polyquest also asserts a claim for unfair trade practices, in violation of North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1. "To recover under the UDTPA, a party must show that (1) the defendant engaged in conduct that was in or affecting commerce, (2) the conduct was unfair or had the capacity or tendency to deceive, and (3) the plaintiff suffered actual injury as a proximate result of defendants' descriptive statement or misrepresentation." *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 164 (2012) (internal quotation marks omitted). Defendants argue that Polyquest has failed to sufficiently allege facts that satisfy any of these required elements.

Defendants specifically argue that Polyquest has not alleged that Defendants engaged in conduct that was in or affecting commerce–the first element of an UDTPA claim–because (1) their alleged actions all took place within the operation of a joint venture and (2) they enjoy a qualified

19

privilege as a non-outsider and/or they acted with a legitimate business justification. The court does not find the latter argument to be any more persuasive in the context of the UDTPA claim than it did in the context of tortious interference claim. The former argument, however, merits more discussion.

North Carolina's UDTPA defines "commerce" to include "all business activities, however denominated," *see* N.C. Gen. Stat. § 75-1.1(b), and the North Carolina Supreme Court has interpreted the term "business activities" to mean "the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase or sale of goods, or whatever other activities the business regularly engages in and for which it is organized." *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 594, 403 S.E.2d 483, 493 (1991) (affirming the dismissal of an UDTPA claim premised on unfair acts relating to raising capital). In *White v. Thompson*, 364 N.C. 47, 691 S.E.2d 676 (2010), the North Carolina Supreme Court further explained that the purpose of UDTPA is "to achieve fairness in dealings between individual market participants." *Id.* at 52, 691 S.E.2d at 679. According to the North Carolina Supreme Court, UDTPA acts to "regulate two types of interactions in the business setting: (1) interactions between businesses, and (2) interactions between businesses and consumers." *Id.* at 52; 691 S.E.2d at 679. The *White* court accordingly held that a partner's unfair conduct toward a partnership, and the members thereof, could not form the basis for a claim under UDTPA because "any unfair and deceptive conduct contained solely within a single business is not covered by the Act." *Id.* at 53, 691 S.E.2d at 680. The parties in *White* were former partners in a Bladen County fabrication and welding business, which enjoyed some initial success in performing construction work at a plant owned by Smithfield Packing Company. *Id.* at 48, 691 S.E.2d at 677. The defendant partner in *White*, while still a member of the partnership, started a competing business and acted to divert business from the original partnership. Because the

20

defendant partner in *White* "unfairly and deceptively interacted only with his partners, his conduct occurred completely within the . . . partnership and entirely outside the purview of the Act." *Id.* at 54; 691 S.E.2d at 680.

Defendants argue that under *White*, the alleged conduct in this case was not "in or affecting commerce" as that phrase is used under UDTPA, because it all occurred within the context of a joint venture. That is, although Defendants' actions were not confined to the internal operations of a "single business," their action were confined to the internal operation of a "single market participant," the joint venture. *See White*, 364 N.C. at 53, 691 S.E.2d at 53 ("[T]he General Assembly did not intend for the Act to intrude into the internal operations of a single market participant."). The court agrees. The alleged unfair or deceptive conduct in this case, at bottom, "only affects relationships within a single . . . market participant"–the joint venture as a whole. *See Powell v. Dunn*, 2014 NCBC 3, 2014 WL 340254, at \*3 (N.C. Business Court Jan. 28, 2014) ("[W]hen the unfair or deceptive conduct alleged only affects relationships within a single business or market participant, and not dealings with other market participants, that conduct is not 'in or affecting' commerce within the meaning of Section 75-1.1, even if other market participants may be indirectly involved in the unfair or deceptive acts."). The fact that separate entities comprise the single market participant does not alter this analysis; the case remains a dispute about the internal operations of the joint venture. Nor does the tangential involvement of Unifi, the company that received the allegedly false invoices in the name of Vestar, mean that Defendants' acts were in or affecting commerce. If that were the case, then the plaintiffs' UDTPA claim in *White* would have survived, given that the Smithfield Packing Company plant's involvement in awarding work to the two separate welding businesses.

21

Because the alleged facts, taken as true, do not show that the Defendants' unfair and/or deceptive acts were "in or affecting commerce," Polyquest's UDTPA claim cannot survive.[4] The Motion to Dismiss [DE-13] is ALLOWED as to that claim only.

## III. MOTION FOR LEAVE TO AMEND COMPLAINT

Polyquest moves for leave to file an amended complaint to assert a claim for conversion of security. Defendants oppose the motion.

Rule 15(a) of the Federal Rules of Civil Procedure provides that a court "should freely give leave [to amend a pleading] when justice so requires." Fed. R. Civ. P. 15(a). The Supreme Court, in *Foman v. Davis*, 371 U.S. 178 (1962), set forth the general standard for district courts to consider when making Rule 15(a) determinations:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claims on the merits. In the absence of any apparent or declared reason such as undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party for virtue of the allowance of the amendment, futility of the amendment, etc., the leave should, as the rules require, be "freely given."

*Id.* at 182 (quoting Fed. R. Civ. P. 15(a)). Thus, in the Fourth Circuit, the law is well settled "that leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999).

Defendants in this case argue that the proposed amendment in this case would be futile for a variety of reasons. Whatever the merit of some of Defendants' reasons, it cannot be in dispute that

---

[4] For this reason, the court does not address Defendants' other arguments as to why the UDTPA claim must be dismissed.

22

the Defendants' actions in allegedly transferring $170,000 from the Polymers' bank account–after they were relieved from their positions of authority with respect to the governance of Polymers–may support a conversion claim. *See Peed v. Burleson's*, 244 N.C. 437, 439, 94 S.E.2d 351, 353 (1956) ("The tort of conversion is well defined as 'an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights.'"). The court therefore does not find the amendment to be futile, and therefore, the Motion for Leave to Amend [DE-24] is ALLOWED. Polyquest is DIRECTED to file a signed amended complaint within seven (7) days of the filing date of this Order.

## III. CONCLUSION

For the foregoing reasons, the Motion to Dismiss [DE-13] is ALLOWED as Polyquest's claim for tortious interference only, and is DENIED in all other respects. Polyquest's Motion for Leave to Amend [DE-24] is ALLOWED, and Polyquest is directed to file a signed amended complaint within seven (7) days of the filing date of this Order.

SO ORDERED.

This the $\overset{\textit{h}}{6}$ day of February, 2014.

James C. Fox

James C. Fox
Senior United States District Judge